# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHNNY REININGER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-16-1241-D |
| | ) | |
| STATE OF OKLAHOMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Defendants' Motion to Dismiss [Doc. No. 26], filed pursuant to Fed. R. Civ. P. 12(b)(1). Plaintiff has filed a response [Doc. No. 28], and Defendants have replied [Doc. No. 29]. Thus, the Motion is fully briefed.

## Background

Plaintiff Johnny Reininger, Jr. is deaf. He resides in Oklahoma and tracks the status of state legislative bills, particularly ones that affect disabled individuals. Defendants State of Oklahoma, Oklahoma State Senate, Oklahoma House of Representatives, and their respective leaders – President Pro Tempore Mike Shulz and Speaker Charles A. McCall – maintain internet websites that show live feeds of legislative hearings and proceedings. Plaintiff claims he does not have meaningful access to this information because the audio content of the online broadcasts is not captioned and he cannot understand what is being said. Plaintiff has contacted both legislative bodies about the lack of captioning and has asked them to bring the websites into compliance with federal disability discrimination laws. Plaintiff alleges that despite an admission of noncompliance, captioning has not been

provided due to budgetary constraints. Defendants state in their Motions that captioning would be cost prohibitive and technologically difficult and, as an alternative, they have offered to provide interpretive services if Plaintiff gives advance notice that he wants to attend a proceeding.

Plaintiff brings suit claiming that Defendants have violated and are violating Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §12131 *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by failing to provide captioning for internet broadcasts of the Oklahoma Legislature's proceedings. Title II of the ADA prohibits the exclusion of a qualified individual with a disability from participation in the services, programs, or activities of a public entity, and implementing regulations require that a public entity "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including . . . members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." *See* 28 C.F.R. § 35.160(b)(1). The Rehabilitation Act extends similar requirements to programs that receive federal financial assistance. Plaintiff alleges that as a result of Defendants' failure to caption, he has been unable to access legislative information that is available to hearing persons, and he has suffered mental anguish and other nonpecuniary losses. Plaintiff seeks a declaratory judgment, compensatory damages, and injunctive relief, to include a mandatory injunction compelling Defendants "to make accessible to individuals who are deaf or hard of hearing all audio and video content on their websites, including by displaying simultaneous captioning." *See* Compl. [Doc. No. 1] at 7 (Relief, ¶ e).

## Defendants' Motion

Defendants seek dismissal on grounds of sovereign immunity under the Eleventh Amendment of the United States Constitution and States' immunity from federal control under the Tenth Amendment. Although Defendants do not designate their Motion as one for partial dismissal, it is clear upon closer inspection that Defendants do not challenge Plaintiff's action in its entirety. Defendants state that while they do not concede the Rehabilitation Act abrogates sovereign immunity, they "believe this argument is best left for summary judgment." *See* Defs.' Mot. Dismiss [Doc. No. 26] at 2, n.2. The Motion addresses the issues of sovereign immunity and States' rights only as they pertain to Plaintiff's ADA claim. *See id.* at 2 ("Defendants assert that they are immune from suit under the ADA and further that application of the ADA in the manner asserted by Plaintiff would be . . . impermissible under the Tenth Amendment.").

Further, Defendants assert that the individuals sued in their official capacities, President Pro Tempore Shulz and Speaker McCall, enjoy sovereign immunity only from an ADA suit for money damages. They admit the Tenth Circuit has authorized an action for prospective injunctive relief against a state official for a violation of the ADA under the *Ex parte Young*[1] doctrine. *See* Defs.' Mot. Dismiss [Doc. No. 26] at 10 (citing *Guttman v. Khalsa*, 669 F.3d 1101, 1127-28 (10th Cir. 2012)). Thus, Defendants Shulz and McCall seek a dismissal based on sovereign immunity only of Plaintiff's ADA claim for damages. *See* Defs.' Mot. Dismiss [Doc. No. 26] at 3, 10, 12; Defs.' Reply Br. [Doc. No. 29] at 5.

---

[1] *Ex parte Young*, 209 U.S. 123 (1908).

However, all other defendants – the State, the Senate, and the House of Representatives – seek dismissal of the ADA action in its entirety. *See* Defs.' Mot. Dismiss [Doc. No. 26] at 3, 9, 12; Defs.' Reply Br. [Doc. No. 29] at 4-5.

Regarding the Tenth Amendment, Defendants do not contend the ADA is unconstitutional as applied to them generally; they assert only that the mandatory injunction Plaintiff seeks would violate the Tenth Amendment. As framed by Defendants, "[t]he issue presented for decision is whether Title II of the ADA commandeers the Oklahoma Legislature if the Court finds that [the legislature] must close caption its floor sessions." *See* Defs.' Mot. Dismiss [Doc. No. 26] at 10; *see also* Defs.' Reply Br. [Doc. No. 29] at 6 ("Because of the type of relief sought the Tenth Amendment acts as a bar.").

## Standard of Decision

Defendants move for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction. As agreed by all parties, there are two types of challenges to subject matter jurisdiction: (1) facial attacks on the sufficiency of the allegations contained in the complaint; and (2) challenges to the actual facts upon which subject matter jurisdiction is based. *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). Here, Defendants make a facial attack on the sufficiency of the allegations contained in the Complaint. Therefore, all well-pleaded factual allegations of the Complaint are accepted as true. *Id*.; *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).

## Discussion

### I. Eleventh Amendment Immunity

The Eleventh Amendment grants immunity to the States from "any suit in law or equity, commenced or prosecuted . . . by Citizens of another State" or by their own citizens. U.S. Const. amend. XI; *see Bd. of Trs. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."). There are three exceptions:

> First, a state may consent to suit in federal court. Second, Congress may abrogate a state's sovereign immunity by appropriate legislation when it acts under Section 5 of the Fourteenth Amendment. Finally, under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief.

*Levy v. Kansas Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168–69 (10th Cir. 2015) (quoting *Muscogee (Creek) Nation v. Pruitt,* 669 F.3d 1159, 1166 (10th Cir. 2012)). In this case, Defendants have not consented to Plaintiff's suit and, as discussed above, they do not oppose an *Ex parte Young* action. Thus, only the second exception is pertinent to the consideration of Defendants' Motion.

Before reaching the issue of whether Congress has abrogated the State's sovereign immunity from Plaintiff's ADA action, it is necessary to determine: "'(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation

5

of sovereign immunity as to that class of conduct is nevertheless valid.'" *Guttman v. Khalsa*, 669 F.3d 1101, 1113 (10th Cir. 2012) (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)).

For purposes of the Motion, Defendants concede that Plaintiff has stated a Title II claim based on their "failure to caption streaming video of legislative sessions." *See* Defs.' Mot. Dismiss [Doc. No. 26] at 5 & n.3. The next step of the analysis also presents no issue for decision; Plaintiff does not allege a violation of the Fourteenth Amendment in the Complaint.[2] *See, e.g., Bearden v. Okla. ex rel. Bd. of Regents*, 234 F.Supp.3d 1148, 1151 (W.D. Okla. 2017) (where plaintiff does not assert a Fourteenth Amendment claim "there is nothing to assess"). Accordingly, because there is an alleged violation of Title II but no violation of the Fourteenth Amendment, the Court must proceed to determine whether Congress has validly abrogated the State's Eleventh Amendment immunity with respect to the conduct at issue.

"[T]here is no question Congress intended Title II [of the ADA] to abrogate state sovereign immunity." *Guttman*, 669 F.3d at 1117; *see* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this

---

[2] The Complaint includes a conclusory statement that Defendants "den[ied] Plaintiff meaningful access to the content of the legislative proceedings." Compl. [Doc. No. 1], ¶ 1. Plaintiff does not argue that this statement alleges a constitutional violation. If it did, Oklahoma could not raise a sovereign immunity defense because "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *See Georgia*, 546 U.S. at 159 (emphasis in original).

chapter."). The remaining question is whether Congress' action "is a valid exercise of its enforcement power under § 5" of the Fourteenth Amendment. *Guttman*, 669 F.3d at 1117; *see Tennessee v. Lane*, 541 U.S. 509, 518 (2004); *Garrett*, 531 U.S. at 364. To make this determination, the Supreme Court announced in *City of Boerne v. Flores*, 521 U.S. 507, 529-36 (1997), a case-by-case framework that requires consideration of the following:

> (1) the nature of the constitutional right at issue; (2) the extent to which Congress's remedial statute was passed in response to a documented history of relevant constitutional violations; and (3) whether the congressional statute is "congruent and proportional" to the specific class of violations at issue, given the nature of the relevant constitutional right and the identified history of violations.

*Guttman*, 669 F.3d at 1117; *see Lane*, 541 U.S. at 522, 523-25, 529-31; *Garrett*, 531 U.S. at 365, 368, 372.

### A. The Nature of the Constitutional Right at Issue

The Supreme Court recognized in *Lane* that Congress enacted Title II to "enforce [the Fourteenth Amendment's] prohibition on irrational disability discrimination," along with "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Lane*, 541 U.S. at 522-23. Because of this breadth, a determination of the validity of a particular application must focus on the constitutional right at stake and "the particular services at issue" in the case. *See id*. at 527; *Guttman*, 669 F.3d at 1117. For example, the Supreme Court identified the right at issue in *Lane* to be a fundamental right of access to the courts and court services that was impaired by physical barriers encountered by the paraplegic plaintiffs in courthouse buildings, and "was an appropriate subject for prophylactic legislation." *Lane*, 542 U.S. at 529.

7

In this case, Plaintiff claims the scope of the right at stake should be viewed as the "right to participation in the political process." Pl.'s Resp. Br. [Doc. No. 28] at 5. In defense of this right, Plaintiff cites the Supreme Court's decision in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995), which stated that "the right of the electors to be represented by men of their own choice, was so essential for the preservation of all their other rights, that it ought to be considered as one of the most sacred parts of our constitution." *Id*. at 795 (internal quotations omitted). Plaintiff argues that without equal, meaningful access to information about the Oklahoma Legislature's sessions he is denied the right to participate fully in the political process, and the right to petition regarding the positions taken by his representatives. Pl.'s Resp. Br. [Doc. No. 28] at 6-7. Plaintiff further argues that his First Amendment right to vote is implicated by Defendants' conduct.

The Court finds that Plaintiff's attempt to broaden the scope of his action to encompass the right to vote is misguided. Although it may be true that Plaintiff's access to information regarding elected representatives is limited by his inability to know what they are saying in legislative hearings, it is certainly not the case that Plaintiff's access to voting itself has been impaired. On the other hand, the Court also rejects Defendants' position that the right at stake is the "right to access streaming videos of legislative sessions." See Defs.' Mot. Dismiss [Doc. No. 26] at 7. This narrow construction of the right fails to recognize the overarching issue, which is a citizen's right to participate in the political process and to have meaningful access to the tools necessary to such participation.

In *Lane,* the Supreme Court considered a fundamental right of access to the courts and participation in court services. *See Lane*, 541 U.S. at 533-34. This right is analogous to a right to participate in the political process that is impaired by a lack of access to legislative statements by elected representatives. Physical access to a public forum is meaningless if the individual is denied, due to a physical impairment, access to publicly available information that allows equal participation in the political process. This right is encompassed in the First Amendment right to "petition the government for a redress of grievances." U.S. Const. amend. I. If a citizen is denied access to information about the legislative positions of his or her representatives, the citizen's ability to adequately petition the government and participate in the political process is severely impaired.

The Court also notes that the Supreme Court has recognized a First Amendment "right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences" through broadcast media. *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). In *Red Lion*, the Court upheld the FCC's "fairness doctrine" that required broadcasters to provide adequate coverage of public issues and to ensure the coverage fairly and accurately reflected opposing views "because the doctrine advanced the substantial government interest in ensuring balanced presentations of views in this limited medium," which has a finite number of frequencies. *See FCC v. League of Women Voters*, 468 U.S. 364, 378 (1984). In *CBS, Inc. v. FCC*, 453 U.S. 367, 396-97 (1981), the Court upheld a statutory right of access to broadcast media for federal candidates because it made "a significant contribution to freedom of expression by enhancing the ability of

candidates to present, and the public to receive, information necessary for the effective operation of the democratic process" and because it defined a sufficiently "limited right of 'reasonable' access" so "the discretion of broadcasters to present their views on any issue or to carry any particular type of programming" was not impaired. "The thrust of these restrictions [on the broadcasting industry] has generally been to secure the public's First Amendment interest in receiving a balanced presentation of views on diverse matters of public concern." *League of Women Voters*, 468 U.S. at 380. Similarly, in this case, where the Oklahoma Legislature is engaged in internet broadcasting of its proceedings to the public, there is an analogous right of access to the information conveyed about state legislative matters.

Under the circumstances, the Court finds that Plaintiff's right to meaningful participation in the political process and right of access to publicly available information needed to participate in the process is a fundamental right, and an infringement of the right should receive heightened scrutiny.

### B. Historical Record of Constitutional Violations

The Court next considers whether there is a historical record and pattern of constitutional violations. Title II of the ADA was enacted in the midst of widespread discrimination against individuals with disabilities in public services and programs. *See Lane*, 541 U.S. at 524 ("Congress enacted Title II against a backdrop of pervasive unequal treatment of persons with disabilities in the administration of state services and programs, including systematic deprivations of fundamental rights."). This included discrimination

against hearing-impaired individuals. *See id.* at 527 (summarizing congressional record that contained "numerous examples of the exclusion of persons with disabilities from state judicial services and programs, including exclusion of persons with visual impairments and hearing impairments from jury service [and] failure of state and local governments to provide interpretive services for the hearing impaired"). Moreover, the Supreme Court in *Garrett* identified many instances in which state agencies discriminated against deaf individuals by denying them access to interpretive services. *See Garrett*, 531 U.S. at 391-424 (Breyer, J., dissenting) (App. C to opinion of Breyer, J.). Although Defendants are correct in their observation that Plaintiff does not offer examples of the exact type of discrimination in question here, the Court finds adequate examples of similar constitutional violations that have been described in other cases.

Defendants are also correct that there is no requirement for legislative proceedings to be broadcast, but the ADA does require that a qualified individual with a disability be afforded equal participation and "benefits of the services, programs or activities of a public entity." *See* 42 U.S.C. § 12132. Congress deemed this requirement to be necessary because "discrimination against individuals with disabilities persists in such critical areas as . . . *public accommodations*, education, transportation, *communication*, recreation, . . . voting, and *access to public services*." *Id.* § 12101(a)(3) (emphasis added).[3] Plaintiff is, by

---

[3] "Public accommodations" may not be limited to buildings and physical structures but may include providers of services and "service establishments," like internet websites. *See Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994); 42 U.S.C. § 12181(7)(F); *but see Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1334 (11th Cir. 2004) (declining to "wad[e] into the thicket of a circuit split on this issue").

definition, a qualified individual with a disability, and due to his disability, he does not have the same access to public legislative proceedings as nondisabled persons. 42 U.S.C. § 12102(1)(A) (defining "disability" to include physical impairment that substantially limits a major life activity, such as hearing). Legislative proceedings are undoubtedly the activities of a public entity, and the internet broadcast of legislative proceedings is a public service. Consequently, Plaintiff's allegations (which are accepted as true), coupled with a history and pattern of unconstitutional discrimination by state governments against hearing-impaired individuals, are sufficient to declare that Congress passed the ADA accommodation statute in response to a documented history of relevant constitutional violations.

## C. Congruence and Proportionality

In exercising its Section 5 powers, "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727-28 (2003). In remedying constitutional violations, "Section 5 legislation is valid if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Lane*, 541 U.S. at 520 (quoting *Boerne*, 521 U.S. at 520). "The question is whether Title II is congruent and proportional to the specific class of violations at issue, given the nature of the relevant constitutional right and the identified history of violations." *Guttman*, 669 F.3d, at 1119-20. Although "congruence and proportionality" has not been well defined by the Supreme Court, the Court has applied the

test in several recent cases, including *Lane*, *Hibbs*, and *Garrett*, and so provided some guidance to lower courts on how to approach the analysis. *See Guttman*, 669 F.3d at 1122-23.

First, before applying the test, it is necessary to "identify the relevant class of state action at issue." *Guttman*, 669 F.3d at 1120. In *Lane*, the court narrowed the category of state action to the specific right of access to the courts, rather than the right of access to all state-owned buildings. *Lane*, 541 U.S. at 530-31. The Court finds that the relevant category of state action here should be similarly tailored, and the analysis should be focused on discrimination implicating the specific individual right of meaningful participation in legislative proceedings.

In constructing a remedy under Section 5, Congress is limited to remedying existing guarantees and cannot alter a substantive constitutional right. *Boerne*, 521 U.S. at 508. Also, "[w]hen fundamental rights . . . or suspect classes . . . are implicated, Congress's historical findings need not be as exhaustive, and the congruence and proportionality of the remedial measure need not be as precise." *Guttman*, 669 F.3d at 1122. Thus, the precision of the remedial measure directly correlates with the significance of the constitutional right being protected. It is established that "persons with disabilities do not compose a suspect class." *Id.* at 1123; *see City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 442 (1985); *Garrett*, 531 U.S. at 367 (applying rational-basis review). However, a citizen's right to meaningful participation in the political process and to access publicly available

information needed to participate in the process, as discussed above, is a fundamental right. Therefore, the prophylactic remedial legislation at issue requires less precision.

Title II of the ADA was enacted in response to widespread discrimination; it attempts to remedy discrimination toward disabled individuals throughout state governments, including state legislatures. The significant number of violations noted and the importance of the right to participate in the legislative process lead to the conclusion that Congress's remedial efforts were congruent and proportional to the injury it sought to prevent. Moreover as Plaintiff notes, Title II allows public entities to assert the affirmative defenses of undue burden and fundamental alteration, and the availability of these defenses ensures that the required accommodations are not overly burdensome. *See* Pl.'s Resp. Br. [Doc. No. 28] at 12; *see also Lane*, 541 U.S. at 531-532.

### D. Conclusion Regarding Sovereign Immunity

In light of the above, the Court concludes that Congress enacted Title II of the ADA to remedy discrimination against deaf individuals by state governments and legislatures, that Plaintiff has sufficiently shown the right of meaningful participation in the political process and access to publicly available information needed to participate in the process is a fundamental right, and that Title II of the ADA is a congruent and proportional measure to enforce that right. Therefore, Oklahoma's sovereign immunity from Plaintiff's ADA claim suit should be deemed abrogated, and Defendants' Motion should be denied as to the defense of sovereign immunity.[4]

---

[4] Alternatively, even without a finding that the right to participate in the political process is a fundamental right, the State's sovereign immunity may be deemed validly abrogated "if

14

## II. Tenth Amendment Commandeering of the Legislature

As part of the relief sought by the Complaint, Plaintiff asks the Court to issue a mandatory injunction directing the Oklahoma Legislature to caption the audio portion of their online broadcast of legislative proceedings. Defendants assert that this request is contrary to the doctrine of dual sovereignty and granting it would violate the Tenth Amendment. They argue that forcing the Oklahoma Legislature to implement captioning would control the manner in which the State and its officials implement the ADA, and would amount to commandeering a state government, which is prohibited under Supreme Court precedents such as *Printz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992). In these and other cases, the Court has held that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925.

One difficulty with this aspect of Defendants' Motion is that they do not seek the dismissal of a claim for relief. *See* Def.'s Mot. Dismiss [Doc. No. 26] at 10-12. Instead, Defendants ask the Court to rule that a particular remedy sought by Plaintiff under the ADA is unavailable. *See id.* at 12 (arguing that Title II of the ADA would invade state

---

Congress found pervasive unconstitutional state conduct." *See Guttman*, 669 F.3d at 1122-23. Pervasiveness has been found primarily in public higher education cases. *See id.* n.4 (citing *Toledo v. Sanchez*, 454 F.3d 24, 39-40 (1st Cir. 2006)); *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 490 (4th Cir. 2005); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555-56 (3rd Cir. 2007); *Ass'n for Disabled Am. v. Fla. Int'l Univ.*, 405 F.3d 954, 956-59 (11th Cir. 2005). Applying the factors identified in those cases – (1) a persistent pattern of exclusion and irrational treatment of disabled individuals, (2) the gravity of harm from such discrimination, and (3) limited compliance costs – the Court could arguably find that Oklahoma's sovereign immunity should be deemed abrogated in this case.

sovereignty under the Tenth Amendment if the Oklahoma Legislature is required to either pass laws or make appropriations to implement captioning).[5] The Court finds, however, that the issue of what relief may be available to Plaintiff if he prevails on his ADA claim is not ripe for decision or appropriate for resolution under Rule 12(b).

Typically, a Rule 12(b) motion tests the sufficiency of a claim and not a prayer for relief. The Tenth Circuit has held that a motion to dismiss is not a proper vehicle for addressing a prayer for relief, which is not part of the cause of action. *See Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 901 (10th Cir. 2011); *Daniels v. Thomas*, 225 F.2d 795, 797 (10th Cir. 1955) ("it is well settled that the prayer for relief is [not] part of the cause of action"); *see also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1255 at 508-09 (3d ed. 2004) (A "demand for judgment is not considered part of the claim . . . . Thus, the selection of an improper remedy in the . . . demand for relief will not be fatal to a party's pleading . . . ."); *Schoonover v. Schoonover*, 172 F.2d 526, 530 (10th Cir. 1949) (Because "the prayer forms no part of the cause of action, . . . a pleader will be entitled to the relief made out by the case and stated in the pleadings, irrespective of what is asked for in the prayer."). This Court has previously held that whether a particular remedy, such as punitive damages, is "recoverable in a case is not a proper subject for adjudication in a Rule 12(b)(6) motion, as the prayer for relief is not a part of the cause of

---

[5] Plaintiff notes that Defendants do not challenge his claim under the Rehabilitation Act on Tenth Amendment grounds. *See* Pl.'s Resp. Br. [Doc. No. 28] at 15 n.7. He argues that the Rehabilitation Act was enacted pursuant to Congress' spending power and requires a different analysis.

16

action." See *Douglas v. Miller*, 864 F. Supp. 2d 1205, 1220 (W.D. Okla. Mar. 30, 2012) (citations omitted); see also *Lee v. ConocoPhillips Co.*, Case No. CIV-14-1391-D, 2016 WL 7496143, *4 (W.D. Okla. Dec. 30, 2016).

Similarly here, where Defendants challenge a prayer for relief under Rule 12(b)(1), the Court finds that an order dismissing Plaintiff's request for injunctive relief would be inappropriate. The Court further finds that a decision whether Plaintiff may obtain a mandatory injunction to enforce the ADA in a particular manner would be premature at this stage of the proceedings, prior to any factual development or determination of liability. Therefore, this aspect of Defendants' Motion should be denied.

## Conclusion

For these reasons, the Court finds that Defendants' Motion should be denied as to both Eleventh Amendment immunity from Plaintiff's ADA action and Tenth Amendment immunity from Plaintiff's request for a mandatory injunction to compel captioning.[6]

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss [Doc. No. 26] is DENIED, as set forth herein.

IT IS SO ORDERED this 9th day of November, 2017.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE

---

[6] Plaintiff's action under the Rehabilitation Act was not addressed by the Motion.